# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 08-CV-3212 (JFB) (ETB)

————————————

BRADLEY A. BLAKEMAN,

Plaintiff,

VERSUS

THE WALT DISNEY COMPANY, WALT DISNEY MOTION PICTURES GROUP, INC., TOUCHSTONE PICTURES, KELSEY GRAMMER, GRAMMNET PRODUCTIONS, STEVEN STARK, TREEHOUSE FILMS, LLC, SWING VOTE – THE MOVIE PRODUCTIONS, LLC, KEVIN COSTNER, JOSHUA MICHAEL STERN, JASON RICHMAN, ROBIN JONAS AND JOHN/JANE DOES I-X,

Defendants.

————————————

**MEMORANDUM AND ORDER**
May 11, 2009

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Bradley A. Blakeman ("Blakeman" or "plaintiff") filed the instant action on August 7, 2008 against The Walt Disney Company, Walt Disney Motion Pictures Group, Inc., Touchstone Pictures, Kelsey Grammer, Grammnet Productions, Steven Stark, Treehouse Films, LLC, Swing Vote – The Movie Productions, LLC, Kevin Costner, Joshua Michael Stern, Jason Richman, Robin Jonas and John/Jane Does I-X (collectively, "defendants"), alleging that defendants infringed upon his copyrighted work "Go November" by creating, producing, and distributing the motion picture "Swing Vote." Specifically, plaintiff asserts a claim

of copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.* against all defendants, and state law claims of (1) unfair competition against defendants Grammer, Stark and Grammnet Productions; and (2) fraud and misrepresentation against defendants Grammer and Stark. Plaintiff seeks an order permanently enjoining all defendants from exploiting any work that infringes upon "Go November," a judgment declaring that all defendants have willfully and maliciously infringed upon plaintiff's copyright, a judgment requiring defendants to afford plaintiff sole story credit for "Swing Vote," an award of actual damages and disgorgement of all profits attributable to "Swing Vote," an award of statutory damages

under 17 U.S.C. § 504, attorney's fees, interests and costs under the Copyright Act, and compensatory and punitive damages under the common law.

Defendants Grammnet Productions and Stark moved to dismiss all claims against them, pursuant to Federal Rule of Civil Procedure 12(b)(2), for lack of personal jurisdiction. Further, all defendants moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss plaintiff's first cause of action for copyright infringement on the following grounds: (1) plaintiff cannot establish that defendants actually copied his "Go November" work; and (2) there is no substantial similarity between "Swing Vote" and protectible elements of "Go November." At oral argument on April 6, 2009, the Court advised the parties that, in an abundance of caution, the Court was converting the defendants' Rule 12(b)(6) motion to a summary judgment motion on the "substantial similarity" issue and provided both sides with an opportunity to submit any additional evidence.

For the reasons set forth herein, the motion to dismiss defendants Grammnet Productions and Stark for lack of personal jurisdiction is denied. Specifically, plaintiff's amended complaint, which alleges that defendants Grammnet Productions and Stark supplied the infringing work to the other defendants with full knowledge that it would be developed into a movie and distributed nationwide (including in New York), satisfies both the requirements of New York's long-arm statute, as well as the Due Process Clause. However, the motion by all defendants to dismiss the copyright claim under Rule 12(b)(6) is granted. In particular, given the vastly different themes, plot, scenes, characters, sequence, pace, setting, and overall concept and feel – and the lack of any similarities of protectible elements in this case in any of those categories – no rational factfinder could conclude that the works are substantially similar. Any similarities between the works are simply *scenes a faire* that are non-protectible components of works that use the framework of a hotly-contested, modern election and, in any event, no rational trier of fact could conclude that the average lay observer would consider the works as a whole to be substantially similar to one another. Accordingly, the Court concludes that the works are not substantially similar as a matter of law and defendants are entitled to summary judgment on the copyright claim. Although the Court would decline to exercise supplemental jurisdiction over the state law claims given the dismissal of the federal claim, plaintiff has requested leave to file a second amended complaint to allege diversity jurisdiction with respect to the state claims. That application is granted, and plaintiff will have 30 days to submit a second amended complaint that provides a basis for the Court's exercise of diversity jurisdiction over the remaining state causes of action.

I. BACKGROUND

A. Facts

The following facts are taken from the amended complaint ("Amended Compl.") and the affidavits and exhibits of the parties and are not findings of fact by the Court, but rather are assumed to be true for the purpose of deciding this motion and are construed in a light most favorable to plaintiff, the non-moving party. The Court also notes that the descriptions of the works at issue here are based upon a review of plaintiff's written works (namely, the treatment and amplification of "Go November") and a

review of defendants' work (namely, the screenplay and motion picture "Swing Vote").

Plaintiff is a political commentator and consultant and the sole proprietor of the copyright to the treatment and amplification entitled "Go November." (Amended Compl. ¶¶ 1, 9.) Defendant Grammer is a well-known actor, producer and director who owns defendant Grammnet Productions ("Grammnet"), a corporation duly organized under the laws of the State of California with production offices in Hollywood, California, and also had a character role in "Swing Vote." (Id. ¶¶ 15-16.) Defendant Stark, a domiciliary of the State of California, was the President of Grammnet during the relevant time frame of the instant action. (Id. ¶ 17; Stark Decl. ¶ 9.) The Walt Disney Company is a publicly traded corporation in the business of, among other things, commercially exploiting feature films. (Amended Compl. ¶ 12.) Touchstone Pictures is a division of the Walt Disney Company and worked in conjunction with Walt Disney Motion Pictures Group, Inc. and/or Swing Vote – The Movie Productions, LLC, a limited liability company duly organized under the laws of the State of California, to distribute "Swing Vote" in the United States and Canada. (Id. ¶ 14.) Treehouse Films, Inc. is a limited liability company duly organized under the laws of the State of California that distributed and/or produced the motion picture "Swing Vote." (Id. ¶ 18.) Defendant Costner is a well-known actor who portrayed the leading role in "Swing Vote," and funded and distributed and/or produced the feature film, in conjunction with other defendants. (Id. ¶ 19.) Defendant Stern wrote and directed the feature film and defendant Jonas served as its executive producer. (Id. ¶¶ 21-22.) Defendants John/Jane Does I-X are various unknown individuals and/or entities who

exploited the feature film. (Id. ¶ 24.)

On or about October 27, 2006, plaintiff and non-party Peter Sobich met with Grammer and Stark at the Grammnet offices in Hollywood, California to discuss development of "Go November." (Id. ¶ 26.) Prior to the meeting, plaintiff mailed a copy of the treatment and amplification of "Go November" to Grammer and Stark, allegedly with the understanding that it would not be used in any manner unless plaintiff was fairly compensated. (Id. ¶¶ 27, 29.)

At the meeting, plaintiff advised Grammer and Stark that: (1) the feature film should be released in late July or early August of 2008; (2) the feature film should cast reporters playing themselves to provide authenticity; (3) the political parties in the feature film should have a "win at all costs" strategy and engage in dirty tricks; (4) the actual 2008 presidential election would be decided by swing voters; (5) the feature film should utilize an electoral "red/blue" map as its logo for marketing purposes; (6) the feature film should "come down to the last day in order to build to a crescendo"; (7) the official website of the feature film should have an interactive feature to involve visitors in the "'political process'" of the film; and (8) the feature film should use the "'trappings' of the Office of the Presidency, like Air Force One, to make it more realistic." (Id. ¶ 31.)

Grammer represented to plaintiff that he would star as the incumbent Republican president in the film production of "Go November"; further, Stark and Grammer agreed that they would assist in finding a screenwriter to develop the treatment and amplification. (Id. ¶ 33.)

### 1. "Go November"

The treatment of "Go November" states, by way of background, the following:

> This story involves a race for the White House. The time frame is just prior to the Convention through Election Day. The Incumbent President is a fatherly Reagan type, moral, likable, principled. The story is about a moral President who is engaged in a very tough race. He has an amoral staff that will do anything to win. The Challenger is a liberal charismatic California U.S. Senator who has a young idealistic staff. "Go November" has a double meaning . . . . first being Election Day the other being the frequency on the Incumbent's staff radio that the staff refers to when something bad is happening or someone is about to get an a** chewing. A staff person would get on the radio and demand that the offending staffer to "Go November," as a result, all staff would "Go November" on their radios to listen to the gossip.

(Lynch Decl., Ex. D, at 1.) The treatment lists the following roles as "Characters" (along with a brief description): (1) for the Incumbent's team – the President, the Vice President, the Chief of Staff, the Campaign Manager, the Advance Director, the Pollster, the Chief Strategist, and Press Secretary; and (2) for the Challenger's Team, the Challenger, the Vice Presidential Candidate, the Chief of Staff, the Campaign Manager, the Advance Director, the Pollster, the Chief Strategist, and the Press Secretary. (*Id*.) The Chief Strategist for the Incumbent is listed as a "main character" for the Incumbent team who "directs the dirty tricks" and dates the Challenger's Press Secretary, who is also listed as a "main character. (*Id*.) The other three characters listed as "main characters" are the respective Advance Directors for the both the Incumbent and Challenger, and the Challenger's Chief Strategist (who is described as the "nemesis" of the Incumbent's strategist).

The treatment further describes over thirty scenes under the heading "Scenario," four scenes under the heading "Vice Presidential Scenes" and five scenes under the heading "Love Interest Scenes." (*Id*. at 2-5.) The scenes describe a number of "dirty tricks" undertaken by both campaigns to undermine the opposing candidate, wherein the Incumbent's operatives concoct and execute the following tricks, among others: (a) rigging the balloons at the Challenger's convention so that they do not drop at the finale (*id*. at 2); (b) unfurling banners bearing derogatory statements written in Chinese at the Challenger's campaign rally in Chinatown (*id*.); (c) manipulating the line of march at a Labor Day parade and bribing parade employees charged with removing horse excrement so that the Challenger is forced to march through a path of horse droppings (*id*. at 3); (d) putting a skin irritant in the Challenger's make-up prior to a debate (*id*.); (e) cutting off the sound system at one of the Challenger's rallies (*id*.); and (f) bringing "bums," the elderly, and the insane to the polls to vote. (*Id*. at 4.) The Incumbent asks his staff about the dirty tricks (*id*. at 3), and

further declares that they have no place in the campaign.  (*Id*. at 4.)  The treatment further describes scenes wherein the Challenger's staff agrees to launch their own "dirty tricks operation," (*id*. at 4), which includes the following: (a) unfurling banners bearing derogatory statements written in Spanish at the Incumbent's "Hispanic Rally" in Texas (*id*.); (b) casting ballots for those who do not speak English (*id*.); and (c) bribing bums with cigarettes and alcohol in order to secure their vote.  (*Id*.)  The treatment also describes a scene where the Incumbent's helicopter arrives at the Iowa State Fair and "[a]s Marine One touches down the Porta-Potties go down like dominos, trapping people inside and when they come out they are covered in crap." (*Id*.)

The "love interest" scenes in the treatment describe the relationship between the Incumbent's Chief Strategist and the Challenger's Press Secretary, wherein they discuss the campaign over the phone, exchange Blackberry messages and share a romantic weekend together.  (*Id*. at 5.)

The amplification further describes "Go November" as the "ANIMAL HOUSE of politics" where "[t]he likeable, moral President is running against a slick, charismatic challenger.  But the real battle is between the President's tough 'do anything to win' campaign team and the challenger's idealist young team that is ready to fight back with every trick they can muster."  (Lynch Decl., Ex. E, at 2.)  It again describes some characters, some key scenes, and other scenarios, similar to the treatment.  (*Id*.)  It also describes a "surprise ending" "with the closing scene of a California voter entering a voting booth.  The voter pulls the lever but we're not able to see their choice.  Credits begin to roll while election results begin to be called."  (*Id*. at 4.)

2. "Swing Vote"

"Swing Vote" follows the journey of Bud Johnson, a recently laid-off single father, convicted felon, recreational drinker and resident of the fictional county of Texico in New Mexico, struggling to raise his precocious, civic-minded daughter Molly. Bud unwittingly becomes the focus of two presidential campaigns when a voting machine malfunction on Election Day casts him as the deciding vote in the race. (*See generally* Lynch Decl., Ex. F.)  Specifically, on Election Day, after Bud disappoints Molly by failing to meet her at the polling place to cast his vote, she forges his name on the electoral roll and sneaks into the voting booth to cast a ballot on his behalf, which is ultimately not counted because of a machine malfunction. (*See id*.)  When the presidential race comes down to the results of Texico County, where the vote is evenly split save for Bud's vote (which was not counted), election officials determine that a follow-up election will be held ten days later for Bud alone. (*Id*.)

When Kate Madison, a local reporter, discovers that Bud will cast the dispositive vote, the campaign teams for both candidates descend upon Bud's hometown, attempting to discern his views on the relevant issues and curry favor with him.  (*Id*.)  Specifically, the incumbent Republican, President Boone, invites Bud and Molly aboard Air Force One, where he offers Bud a beer, permits him to hold the briefcase containing the "nuclear football," and discusses football as a metaphor for national security, suggesting that an inexperienced Democratic Senator from Vermont could not protect the country from nuclear warfare with North Korea.  (*Id*.)  The President later sends Richard Petty, famous

Nascar driver and a hero of Bud's, to take Bud and Molly for a ride. (*Id.*) The Democratic challenger, Senator Greenleaf from Vermont, arranges for Bud to play a musical set with his band at a gala attended by Bud's musical hero, Willie Nelson. (*Id.*) After a Presidential aide overhears Bud expressing concern to Senator Greenleaf about proposed dam construction on a river where he fishes, President Boone declares the river a national wildlife preserve, switching positions on the issue and angering his corporate donors. (*Id.*) When Bud unwittingly suggests in a news interview that he is anti-immigration and pro-life, Senator Greenleaf runs advertisements adopting those positions in contravention of his party's platform. (*Id.*) Likewise, when Bud suggests that he supports same-sex marriage rights, President Boone runs an advertisement supporting the same, in contravention of his party's platform. (*Id.*)

Meanwhile, the town is besieged by the media and special interest groups also hoping for insight as to Bud's opinions on the relevant issues. (*Id.*) The film features several "real life" news personalities, including Chris Matthews, Tucker Carlson, Mary Hart, Arianna Huffington, James Carville, Larry King and Bill Maher, to name a few. (*Id.*) Aside from press attention, Bud and Molly are also inundated with letters from Americans expressing their views on the election issues. (*Id.*) Molly dutifully reads the letters and attempts to respond. (*Id.*) She decides that the candidates should have one last debate, where they answer questions asked by Bud and posed by Americans who submitted letters to him. (*Id.*)

The candidates, meanwhile, begin to doubt the strategy advised by their respective campaign managers; Senator Greenleaf has a confrontation with his wife wherein she accuses him of standing for nothing, and President Boone begins to offer Bud a job in exchange for his vote, but has a change of heart. (*Id.*) When the candidates express their misgivings to their campaign managers, the managers encourage them by suggesting that they must first win the presidency before they can pursue the ideals that inspired them to run for public office in the first place. (*Id.*)

After Molly arranges for Kate Madison to interview Bud, she expresses interest that the two will strike up a romantic relationship, as she likes and respects Kate. (*Id.*) When Bud disappoints Molly by failing to remember "Bring Your Father to School Day" at Molly's school, she visits Kate and begins to reveal that it was she, not Bud, who attempted to cast the deciding vote. (*Id.*) When Kate leaves the room to answer the telephone, Molly notices that Kate has been secretly recording their conversation. (*Id.*) Angry and disappointed, Molly decides to visit her biological mother, who tells Molly she does not want to have a relationship with her. (*Id.*) After the Secret Service, (tasked with protecting Bud and Molly during the ten days until the election), informs Bud both that Molly is missing and that she has developed a crush on a classmate, he goes to pick her up at her mother's, ashamed that he has let her down and that virtual strangers know more about her personal life than he does. (*Id.*)

When Bud and Molly return home, Kate is waiting with an apology for Molly and a copy of the tape she recorded. (*Id.*) Upon Molly's request, Kate agrees to help Bud prepare for the debate the next night. (*Id.*) Bud, Molly, Kate and the Secret Service agent tasked with their protection stay up all night preparing questions for the debate. (*Id.*) The next night, after an emotional speech to the country in which he reveals that he has been a

disappointment to his daughter and an undeserving, apathetic recipient of the right to vote, Bud begins to pose the submitted questions to the candidates. (*Id.*) The next day, he and Molly go to the polling place, where he casts the deciding vote. (*Id.*) The film does not reveal who received his vote and the credits roll. (*Id.*)

## B. Procedural History

Plaintiff filed his complaint on August 7, 2008, and amended it on August 12, 2008. Defendants The Walt Disney Company, Walt Disney Motion Pictures Group, Inc. and Touchstone Pictures and Grammer filed their respective answers to the amended complaint on October 3, 2008. On October 24, 2008, this matter was assigned to the undersigned. All defendants moved to dismiss the action on January 16, 2009. Plaintiff filed his opposition on March 2, 2009. Defendants replied on March 12, 2009. Oral argument was held on April 6, 2009.

In their written submissions, both plaintiff and defendants asked that, for the purposes of the Rule 12(b)(6) motion to dismiss, the Court consider the motion picture "Swing Vote," appended to the motion papers of both parties as an exhibit. Plaintiff also submitted the "Swing Vote" screenplay for the Court's consideration. Defendants further requested that the Court consider the treatment and amplification of "Go November," also appended as an exhibit to their motion papers. As both works are referenced in the amended complaint and are "integral to the complaint," the Court may properly consider these materials in connection with a motion to dismiss. *See, e.g., Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (the Court may consider a document not appended to the complaint if the document is "incorporated in

[the complaint] by reference" or is a document "upon which [the complaint] *solely* relies and . . . is *integral to the complaint*.") (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)) (emphases in original). In fact, in copyright cases, many courts have, after comparing the works at issue, dismissed infringement claims for failure to state a claim where substantial similarity between the works cannot be found. *See, e.g., Nelson v. PRN Prods., Inc.*, 873 F.3d 1141, 1143-44 (8th Cir. 1989); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 629 (S.D.N.Y. 2008); *Adams v. Warner Bros. Pictures Network*, No. 05 CV 5211 (SLT), 2007 WL 1959022, at *4-*5 (E.D.N.Y. June 29, 2007), *aff'd*, 289 Fed. Appx. 456 (2d Cir. 2008); *Le Book Pub. Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 309-10 (S.D.N.Y. 2005); *Tabachnik v. Dorsey*, No. 04 Civ. 9865 (SAS), 2005 WL 1668542, at *5 (S.D.N.Y. July 15, 2005), *aff'd*, 257 Fed. Appx. 409 (2d Cir. 2007); *Bell v. Blaze Magazine*, No. 99 Civ. 12342 (RCC), 2001 WL 262718, at *3 (S.D.N.Y. Mar. 16, 2001); *Boyle v. Stephens, Inc.*, No. 97 Civ. 1351 (SAS), 1998 WL 80175, at *4 (S.D.N.Y. Feb. 25, 1998), *aff'd*, 21 Fed. Appx. 76, 2001 WL 1313784 (2d Cir. 2001); *Buckman v. Citicorp*, No. 95 Civ. 0773 (MBM), 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996), *aff'd*, 101 F.3d 1393 (2d Cir. 1996). In other words, in the copyright context, when analyzing the issue of substantial similarity based upon a comparison of the two works, it is clear that courts may decide the issue without permitting discovery. *See, e.g., Nelson*, 873 F.2d at 1144; *see also Green v. Proctor & Gamble, Inc.*, 709 F. Supp. 418, 421 (S.D.N.Y. 1989) ("nothing that could be found by the plaintiff in discovery would change this Court's findings with regard to [lack of substantial similarity]"). This Court confirmed at oral argument with counsel that

there was nothing beyond a review of the "Go November" written works (that is, the treatment and amplification), as compared to the screenplay and motion picture "Swing Vote" (as contained in the "Swing Vote" DVD release submitted to the Court), that would be relevant for purposes of determining substantial similarity.

Nevertheless, in an abundance of caution, the Court provided notice to the parties at oral argument that it was converting the Rule 12(b)(6) motion to dismiss into a motion for summary judgment and was going to consider the "Go November" and "Swing Vote" works in connection with that motion (which had already been submitted to the Court), as well as any other evidence the parties wished to submit on the issue of substantial similarity. Thus, the Court provided both sides with an opportunity following oral argument to make further evidentiary submissions to the Court by April 20, 2009 on the "substantial similarity" issue. Neither side made any additional evidentiary submissions. Moreover, plaintiff agreed with defendants that "[n]o additional discovery is needed on this issue" of substantial similarity. (Letter of Plaintiff's Counsel, dated April 21, 2009, at 1.) However, counsel for plaintiff did submit additional legal arguments in his letter, dated April 21, 2009, further addressing the legal issues surrounding the question of "substantial similarity." On April 29, 2009, the defendants responded to plaintiff's letter.

Accordingly, this matter is fully submitted, and the Court has considered all the evidentiary and legal submissions of the parties.

II. STANDARD OF REVIEW

A. Rule 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). However, prior to discovery, the plaintiff "need only make a *prima facie* showing of jurisdiction through its own affidavits and supporting materials to defeat the motion." *Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928, 930 (2d Cir. 1988) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). Furthermore, in considering a Rule 12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are to be resolved in plaintiff's favor. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 85 (2d Cir. 2001). However, a plaintiff's "unsupported allegations" can be rebutted by "direct, highly specific, testimonial evidence[.]" *Schenker v. Assicurazaioni Generali, S.p.A., Consol.*, No. 98 Civ. 9186, 2002 WL 1560788, at *2 (S.D.N.Y. July 15, 2002).

B. Rule 12(b)(6)

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007). "[O]nce a claim

has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In connection with a motion to dismiss under Rule 12(b)(6), the Court generally may only consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis*, 421 F.3d at 100; *accord Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991). The Court may only consider a document not appended to the complaint if the document is "incorporated in [the complaint] by reference" or is a document "upon which [the complaint] *solely* relies and . . . is *integral to the complaint*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)) (emphases in original). Further, the Court may consider "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, . . . and [] facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and vacated in part on other grounds sub nom. Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 395 F.3d 25 (2d Cir. 2005), *vacated on other grounds*, 547 U.S. 71 (2006); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim"); *Brodeur v. City of New York*, No. 04 Civ. 1859, 2005 U.S. Dist. LEXIS 10865, at *9-*10 (E.D.N.Y. May 13, 2005) (court could consider documents within the public domain on a Rule 12(b)(6) motion to dismiss).

## C. Summary Judgment

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . The nonmoving

party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *St. Paul Mercury Ins. Co. v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, No. 04 Civ 360 (DGT), 2007 U.S. Dist. LEXIS 56884, at *18 (E.D.N.Y. Aug. 2, 2007). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### III. DISCUSSION

Because the court should first determine whether a party is properly present before considering substantive issues, the Court will first address the motion to dismiss by defendants Grammnet Productions and Stark for lack of personal jurisdiction and then address the substantive issues raised by the motion filed by all defendants with respect to the copyright infringement claim. *See, e.g., In re DES Cases*, 789 F. Supp. 552, 560 (E.D.N.Y. 1992) ("On the theory that a court ought to first determine whether a party is properly present before considering substantive issues, the normal practice is to consider 12(b)(2) motions prior to 12(b)(6) motions.") (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc)). As discussed in detail below, the Court concludes that the motion to dismiss for lack of personal jurisdiction is without merit, but finds that all defendants are entitled to summary judgment on the copyright infringement claim because no substantial similarity exists between "Go November" and "Swing Vote" as a matter of law.

### A. Personal Jurisdiction

It is well settled that "[i]n diversity or federal question cases the court must look first to the long-arm statute of the forum state, in this instance, New York."[1] *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). "If the exercise of jurisdiction is appropriate under that statute, the court then must decide whether such exercise comports with the requisites of due process." *Id.* Thus, the district court should engage in a two-part analysis in resolving personal jurisdiction

---

[1] Thus, the same standard for personal jurisdiction applies to plaintiff's federal claim under the Copyright Act, *see, e.g.*, *Davis v. United States of America*, No. 03 Civ. 1800 (NRB), 2004 WL 324880, at *5 (S.D.N.Y. Feb. 19, 2004) ("Where, as here, no applicable federal statute provides for nationwide service of process, New York law governs the question of personal jurisdiction.") (citations omitted), as well as his state law claims, *see, e.g., Nader v. Getschaw*, No. 99 Civ. 11556 (LAP), 2000 WL 1471553, at *2 (S.D.N.Y. Sept. 29, 2000) ("Personal jurisdiction in a diversity case is determined first by the law of the state in which the district court sits.") (citations omitted).

issues: (1) whether New York law would confer jurisdiction by New York courts over defendants; and (2) whether the exercise of jurisdiction over defendants comports with the Due Process Clause of the Fourteenth Amendment. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).

Under New York law, there are two bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to N.Y. C.P.L.R. § 301, and (2) long-arm jurisdiction pursuant to N.Y. C.P.L.R. § 302. As set forth below, plaintiff's amended complaint satisfies both the strictures of New York law under the state's long-arm statute, as well as the requirements of due process. Accordingly, defendants Grammnet and Stark's motion to dismiss the action for lack of personal jurisdiction is denied.

### 1. Long-Arm Jurisdiction

Under N.Y. C.P.L.R. § 302(a), "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or (3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives

substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a); *see also Overseas Media, Inc. v. Skvortsov*, Nos. 06 Civ. 4095 (L), 07 Civ. 2952 (CON), 2008 U.S. App. LEXIS 10128, at *5 (2d Cir. May 8, 2008).

Here, plaintiff alleges that Section 302(a) is applicable to Grammnet and Stark because the allegedly infringing work, "Swing Vote," was shown in movie theaters and distributed via DVD throughout the United States, which would obviously include New York. Defendants Grammnet and Stark submit that neither defendant was involved in the production or distribution of "Swing Vote," and, therefore, even if either was somehow liable for copyright infringement, that wrongful act took place in California, where the alleged wrongful appropriation of Blakeman's treatment and amplification occurred. However, plaintiff has alleged in his amended complaint that defendants Grammnet and Stark's unlawful appropriation of plaintiff's treatment and amplification directly led to the creation, production, and distribution of "Swing Vote," the latter of which unquestionably is alleged to have occurred, among other places, in New York State. Accordingly, plaintiff argues, Section 302(a)(2) is applicable. For the reasons set forth below, the Court agrees.

It is well-settled that New York state long-arm jurisdiction is appropriate over a person or agent who "commits a tortious act within the state." N.Y. C.P.L.R. § 302(a)(2). Further, because "[c]opyright infringement is a tort," *H. M. Kolbe Co. v. Shaff*, 240 F. Supp. 588, 589 (S.D.N.Y. 1965), *aff'd*, 352 F.2d 285 (2d Cir. 1965), and "copyright infringement is deemed to take place at the point of consumer purchase[, u]nder certain circumstances, a non-domiciliary who merely supplies

infringing goods to the party that ultimately passes them off in New York may be subject to jurisdiction under 302(a)(2)." *Dan-Dee Int'l, Ltd. v. Kmart Corp.*, No. 99 Civ. 11689 (DC), 2000 U.S. Dist. LEXIS 13411, at *10 (S.D.N.Y. Sept. 19, 2000) (internal quotations and citations omitted); *see Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 91 (S.D.N.Y. 1997) ("Courts in this jurisdiction have sometimes used a theory of 'contributory infringement' to exert jurisdiction under § 302(a)(2) over non-domiciliaries who, while not directly passing off infringing goods in the jurisdiction, supplied the infringing goods that were ultimately passed off by another. Under this contributory infringement theory, a non-domiciliary manufacturer or distributor may be subject to personal jurisdiction upon a showing that it sold a product to an importer (such as [defendant]), with full knowledge that the product will or can reasonably be expected to be resold in the jurisdiction, where it will infringe the plaintiff's mark.") (internal citations omitted); *see also Mantello v. Hall*, 947 F. Supp. 92, 101 (S.D.N.Y. 1996) ("To satisfy § 302(a)(2), in cases involving copyright infringement and violations of the Lanham Act, the offering, display or sale of the allegedly infringing product must occur in New York.").

In the instant case, plaintiff has alleged that Grammnet and Stark supplied the plaintiff's work – *i.e.*, the treatment and amplification of "Go November"– to the other defendants with full knowledge that the other defendants were going to infringe on plaintiff's work by developing the motion picture "Swing Vote" and distribute the infringing work throughout the nation (including the State of New York). Given these allegations that defendants Grammnet and Stark participated in the copyright infringement by supplying the plaintiff's work

with knowledge that the subsequent infringing movie would be distributed in New York, the Court finds that the requirements of Section 302(a)(2) are met as to both defendants Grammnet and Stark.[2] *See, e.g., Cartier v. Oakley, Inc.*, No. 06 Civ. 5841 (LAP), 2006 U.S. Dist. LEXIS 90112, at *9-*10 (S.D.N.Y. Dec. 11, 2006) (jurisdiction under § 302(a) appropriate over non-domiciliary who supplied infringing product with knowledge it would be distributed in New York); *Dan-Dee Int'l, Ltd.*, 2000 U.S. Dist. LEXIS 13411, at *10 (same); *Capitol Records, Inc. v. Kuang Dyi Co. of RM*, No. 03 Civ. 520 (LAP), 2004 U.S. Dist. LEXIS 3305, at *4 (S.D.N.Y. Mar. 4, 2000) (same).

## 2. Requirements of Due Process

Having concluded that personal jurisdiction over defendants Grammnet and Stark exists pursuant to New York's long-arm statute, the Court must next determine whether the exercise of jurisdiction over the defendants comports with the Due Process Clause of the Fourteenth Amendment, which requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State,

[2] Plaintiff also argues the following, in the alternative, in opposition to defendants' motion: (1) general jurisdiction exists over Grammnet and Stark; (2) long-arm jurisdiction exists under Section 302(a)(1) based upon defendants' alleged transaction of business in New York State; and (3) at a minimum, plaintiff is entitled to discovery on the personal jurisdiction issue. However, because the Court has found that the amended complaint makes out a *prima facie* showing of personal jurisdiction under Section 302(a)(2) – namely, committing a tortious act within New York State – and that (as discussed *infra*) such jurisdiction satisfies due process, the Court need not address these alternative arguments by plaintiff.

thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there."). Because plaintiff has alleged that Grammnet and Stark supplied the plaintiff's work to distributors with the knowledge that the resulting infringing work would be disseminated in New York, the Court finds that, if these allegations are proven, it would be reasonably foreseeable to them that they would be subject to suit in New York State and they would have been purposefully availing themselves of the privilege of conducting activities in this State. *See also Topps*, 961 F. Supp. at 90 ("Ordinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits.").

Therefore, construing the pleadings in the light most favorable to plaintiff, the non-moving party, and resolving all doubts in his favor, the Court concludes that he has successfully pled a *prima facie* case of personal jurisdiction over defendants Grammnet and Stark and their motion to dismiss on that ground must be denied.

B. Copyright Infringement

Plaintiff has alleged that defendants improperly appropriated his copyrighted work, "Go November," in creating, producing, and distributing "Swing Vote" in violation of the Copyright Act. Defendants argue that the claim fails as a matter of law. As discussed in detail below, the Court agrees that the claim fails as a matter of law on the "substantial

similarity" issue.[3]

1. Legal Standard

In order "[t]o establish copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *see Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147, 158 (E.D.N.Y. 2002). For the purposes of the instant motion, defendants do not contest that plaintiff has a valid copyright to the treatment and amplification of "Go November." (*See* Defendant's Memorandum of Law, at 11.) Therefore, in order to meet the second requirement of the *Feist* analysis, plaintiff must demonstrate the following: "(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Fisher-Price, Inc. v. Well-Made Toy Mfg., Corp.*, 25 F.3d 119, 122-23 (2d Cir. 1994) (emphasis in original); *see Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) ("[A] plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'") (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d

---

[3] Although defendants also argue that plaintiff cannot establish that defendants actually copied his work, the Court declines to address this issue because it finds, as discussed *infra*, that the claim must fail, even assuming *arguendo* that defendants actually copied a portion of his work, because no "substantial similarity" between the works exists as a matter of law in the instant case.

Cir. 1998)).

However, "[b]ecause direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material . . . and that there are similarities between the two works that are probative of copying." *Jorgensen*, 351 F.3d at 51 (internal quotations and citations omitted); *Adams v. Warner Bros. Pictures Network*, No. 05 Civ. 5211 (SLT) (LB), 2007 WL 1959022, at *3 (E.D.N.Y. June 29, 2007) ("In the context of deciding whether the defendant copied at all (as distinguished from whether it *illegally* copied), similarity relates to the entire work, not just the protectible elements, and is often referred to as 'probative similarity.'") (internal citation omitted) (emphasis in original); *see also Fisher-Price, Inc.*, 25 F.3d at 123 (2d Cir. 1994); *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 701 (2d Cir. 1992). "Probative similarity is a less demanding test than substantial similarity and requires only that the works are similar enough to support an inference that the defendant copied the plaintiff's work. Stated somewhat differently, the plaintiff must establish that there are similarities between the two works that would not be expected to arise if the works had been created independently. In this analysis, a court must examine the entire work, not just the protectible elements." *Eve of Milady v. Moonlight Design Inc.*, 48 U.S.P.Q.2d 1809, 1812 (S.D.N.Y. 1998) (internal quotations and citations omitted); *Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F. Supp. 1328, 1337 (S.D.N.Y. 1997) ("'Substantial similarity' for the purposes of proving 'actual copying' through circumstantial evidence is different from 'substantial similarity' for the purposes of showing illegal copying. Thus,

courts have referred to 'substantial similarity,' in the context of determining 'actual copying' as 'probative similarity' to distinguish it from the demonstration of 'substantial similarity' needed to prove illegal copying.") (internal citations omitted).

In determining probative similarity, the Court should ask "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner Bros. v. Amer. Broad. Cos.*, 654 F.2d 204, 208 (2d Cir. 1981); *see also O.P. Solutions, Inc. v. Intellectual Property Network, Ltd.*, No. 96 Civ. 7952 (LAP), 1999 WL 47191, at *3 (S.D.N.Y. Feb. 2, 1999) (stating that probative similarities are those that, "in the normal course of events, would not be expected to arise independently in the two works.") (citing Melville B. Nimmer & David Nimmer, 3 NIMMER ON COPYRIGHTS, § 13.03[B], at 13-11 to 13-13 (1995)). In doing so, the Court should note similarities and dissimilarities "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 588.

Once a plaintiff has established that the defendant had access to the protected work and that a "probative similarity" exists between the *entirety* of that work and the allegedly infringing work, the Court then must determine whether, in the eyes of a "lay observer," a "substantial similarity exists between the allegedly infringing work and the *protectible* elements of plaintiff's." *Well-Made Toy*, 210 F. Supp. 2d at 159 (emphasis added); *see also Williams*, 84 F.3d at 587 (stating that there is no substantial similarity as a matter of law "[i]f 'the similarity concerns only noncopyrightable elements of plaintiff [sic] work,' or 'no reasonable trier of

fact could find the works substantially similar, . . . .") (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986), *cert. denied*, 476 U.S. 1159 (1986)). To that end, the law is clear that "a copyright does not protect an idea, but only the expression of an idea," *Kregos v. The Assoc. Press*, 3 F.3d 656, 663 (2d Cir. 1993), and, therefore, "*scenes a faire*, sequences of events that 'necessarily result from the choice of a setting or situation,' do not enjoy copyright protection." *Williams*, 84 F.3d at 587 (quoting *Walker*, 784 F.2d at 50). Further, the Second Circuit has cautioned courts making this determination "to inquire only whether 'the *protectible elements, standing alone*, are substantially similar.'" *Williams*, 84 F.3d at 588 (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995) (emphasis in original)). Finally, courts must also "recognize that dissimilarity between some aspects of the works will not automatically relieve the infringer of liability, for no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated. It is only when the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of small import quantitatively or qualitatively that the defendant will be found innocent of infringement." *Williams*, 84 F.3d at 588 (citing *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992) and Melville B. Nimmer & David Nimmer, 3 NIMMER ON COPYRIGHTS, § 13.03[B][1][a]) (1995) (internal quotations omitted)).

In the instant case, plaintiff has alleged, and defendants do not contest for the purposes of this motion, that defendants had access to the treatment and amplification of "Go November." Therefore, one question before the Court is whether a probative similarity

exists between "Swing Vote" and the entirety of the treatment and amplification of "Go November." Defendants argue that no such probative similarity exists as a matter of law. However, the Court need not address that issue because, even assuming *arguendo* that probative similarities do exist between the two works and there was actual copying, plaintiff's claim still fails as a matter of law, as he cannot demonstrate a "substantial similarity" between the works.[4]

_____

[4] The Court recognizes that the question of substantial similarity is generally a factual inquiry reserved to the trier of fact. *See Hoeling v. Universal City Studios*, *Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) ("Because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation.") (internal citation omitted); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir. 1980) (the question of infringement "is generally resolved by the fact-finder's prediction of the probable reaction of a hypothetical 'ordinary observer'") (citation omitted). However, the Second Circuit has also emphasized that "a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff [sic] work, or when no reasonable trier of fact could find the works substantially similar." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986); *accord Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) (affirming summary judgment determination on "substantial similarity" issue). As discussed *supra*, and as noted by one court, "there is ample authority for the proposition that a district court may make that determination on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005); *see Boyle v. Stephens, Inc.*, No. 97 Civ. 1351, 1998 WL 80175, at *4 (S.D.N.Y. Feb. 25, 1998) ("If after examining the works themselves, this Court determines that there is no substantial similarity, then the plaintiff here can prove no facts in

## 2. Application

The central issue with respect to defendants' motion is whether the works at issue are substantially similar. As set forth below, having carefully reviewed the plaintiff's "Go November" work (namely, his treatment and amplification) and the allegedly infringing screenplay and movie "Swing Vote," the Court concludes that any similarities between the works concern only non-copyrightable elements of plaintiff's work and, in any event, no rational trier of fact could possibly find that the works are substantially similar.

First, the main themes and plot of the respective works are entirely different. "Go November" was described in the amplification by plaintiff as the "Animal House"[5] of politics

which, in the context of a closely-contested presidential election, emphasizes the battle between "the President's tough 'do anything to win' campaign team and the challenger's idealist young team that is ready to fight back with every trick they can muster." (Lynch Decl., Ex. E, at 2.) Thus, the movie centers around a series of "dirty tricks" undertaken by both campaigns – including rigging balloons at the opponent's convention, planting a skin irritant in the Challenger's make-up prior to a debate, bribing parade employees so the Challenger is forced to march through a path of horse droppings, and numerous other similar tricks. "Go November" also has several scenes that focus on the "love interest" between the Incumbent's Chief Strategist and the Challenger's Press Secretary. While "Go November" (based on the treatment and amplification) follows the exploits of the campaign staffers, including their various "dirty tricks" and romantic liaisons, "Swing Vote" focuses on the relationships between the flawed protagonist, his daughter, and a local reporter. Specifically, "Swing Vote" follows the journey of Bud Johnson – an

---

support of his claim which would entitle him to relief – the standard for dismissal under Rule 12(b)(6).") (citation omitted); *see also Bell v. Blaze Magazine*, No. 99 Civ. 12342, 2001 WL 262718, at *3 (S.D.N.Y. Mar. 16, 2001) ("If a court determines that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities pertain only to unprotected elements of the work, it is appropriate for the court to dismiss the action because, as a matter of law, there is no copyright infringement."). Here, the Court converted the Rule 12(b)(6) motion to a motion for summary judgment in an abundance of caution and, after carefully reviewing the works, concludes that this is one of those instances where no discovery or trial is necessary because "substantial similarity" is clearly lacking as a matter of law.

[5] Although the treatment does not describe "Animal House," such a description is unnecessary because that movie has become a part of American pop culture. "Animal House" is a feature film, released in 1978, which follows the exploits of "the inhabitants of Faber [College]'s

most disreputable fraternity house" as they "guzzle and spit beer, drive motorcycles indoors, dump Fizzies in the school swimming pool, pile up 1.2 grade-point averages on their 'permanent records' and wreck the homecoming parade . . . . The film's plot has something to do with the efforts of a mean dean (John Vernon) to shut down the frat house, but it is really just an excuse for a series of bits that are far too hot for TV's Saturday Night Live." Frank Rich, "School Days," NEWSWEEK MAGAZINE (Aug. 14, 1978). Based on the description of scenes contained in "Go November," the Court concludes that the invocation of the film "Animal House" in the amplification of the copyrighted work hearkens to the film's particular brand of provocative, puerile humor.

unemployed single father, convicted felon, recreational drinker and resident in a fictional county in New Mexico – who is struggling to raise his young daughter. The movie explores his personal journey with his daughter in a unique context – namely, he unwittingly becomes the focus of two presidential campaigns when, because of a voting machine malfunction which caused his vote not to be counted on Election Day, he will be allowed to re-cast his one vote which will decide the evenly-tied Presidential election. The reporter, Kate Madison, becomes a part of that journey, as she tries to help Bud develop an appreciation for the issues that are important to the American people and is intertwined in Bud's relationship with his daughter. Thus, while "Go November" purports to be the "'Animal House'" of politics," "Swing Vote" is a sentimental comedy that examines a presidential race through the lens of an "Everyman" figure, using both the election as well as his relationship with his daughter to track his journey from irresponsible oaf to concerned citizen. In short, the themes of the movies share nothing in common other than the backdrop of a Presidential election. To say that these movies are substantially similar because of the common theme of a Presidential election would be as irrational as saying the movie "Animal House" is substantially similar to "Rudy" or "Good Will Hunting" because the movies all focus on college life.

Second, other than both movies ending with a voter entering the booth and the viewer not knowing which candidate won, none of the several dozen scenes described in plaintiff's "Go November" work appear in "Swing Vote." In particular, the treatment contains over thirty scenes under the heading "Scenario," four scenes under the heading "Vice Presidential Scenes," and five scenes

under the heading "Love Interest Scenes." With the exception of the ending, nothing remotely resembling any one of the non-generic scenes in "Go November" is contained in "Swing Vote." Similarly, the "Go November" amplification lists some "key scenes" and "other scenarios," none of which appear in "Swing Vote." In fact, in his opposition papers, plaintiff concedes that none of the approximately 15 "dirty tricks" scenes outlined in detail in "Go November," which are critical to the movie, appear in any manner in "Swing Vote." (*See* Plaintiff's Memorandum of Law, at 12 ("True, the dirty tricks played in Go November are different dirty tricks than the ones in Swing Vote . . . .").)[6]

Third, there is absolutely no one in "Go November" that remotely resembles the three critical characters in "Swing Vote" – Bud Johnson, his daughter Molly, and reporter Kate Madison. While the treatment of "Go November" lists five campaign staffers as "main characters," highlights a love affair between two of them and details the animosity each staff feels for the other, "Swing Vote" features only two campaign staffers, and they do not drive the central plot of the story, nor interact with one another in any capacity whatsoever. In addition, although both movies contain stock characters such as the candidates and their scheming campaign strategists, as discussed *infra*, such characters are not protectible elements of a copyrighted work under the *scenes a faire* doctrine.

Fourth, there is nothing similar about the

---

[6] When asked at oral argument to name any such similar scene, other than the ending, plaintiff's counsel did not identify any particular scene, but rather focused on the overall pace and sequencing. (*See* Oral Argument Transcript, at 30-31.)

structure, sequence or pace of "Go November" and "Swing Vote." In "Go November," plaintiff describes quick-hitting snippets of dirty campaign tricks with the action jumping from one campaign to another. In contrast, the campaign schemes in "Swing Vote" are broken up within lengthy scenes featuring Bud, Molly, and Kate (the reporter Molly identifies as a possible love interest for her father).

Finally, given the overwhelming lack of similarities of themes, plots, scenes, characters, structure, sequence, feel or pace, the fact that both works end with a voter going into a booth and the credits rolling without the winner being known cannot rationally transform "Swing Vote" into a substantially similar work to "Go November." As an initial matter, the scenes are different in the sense that Bud Johnson is walking into the booth to decide a presidential election with one vote under unique circumstances, while the voter in "Go November" is simply some random voter walking into the booth. Moreover, as discussed in more detail *infra*, the final scene in "Swing Vote," although it will decide who becomes the next President, is essentially immaterial to the overall work because the movie is about Bud Johnson's personal journey, rather than the ultimate winner of the election.

In sum, any similarities between the works concern noncopyrightable aspects of plaintiff's work and, even assuming *arguendo* any similarities were copyrightable, the similarities are of such small import, both quantitatively and qualitatively, that no rational trier of fact could find the works to be "substantially similar." Accordingly, because no substantial similarity exists between the works as a matter of law, plaintiff's copyright infringement claim cannot survive summary

judgment and must be dismissed.

In reaching this decision, the Court has carefully considered the various arguments by plaintiff and finds them unpersuasive. Specifically, plaintiff argues that the works are substantially similar primarily because of the following: (1) the central political characters in both works are identical; (2) both works feature "dirty tricks"; (3) both works portray the candidates' staffs as "amoral"; (4) the structure, sequence and pace of both works are identical; and (5) the endings are identical. The Court addresses each "similarity" issue in turn.

Plaintiff correctly notes that the central political characters in each work are an incumbent Republican, a liberal idealist challenger and two campaign strategists of questionable morals. For example, the treatment asserts that "[t]he Incumbent President is a fatherly Reagan type, moral, likeable, principled." (Lynch Decl., Ex. D, at 1.) Plaintiff argues that, in "Swing Vote," the incumbent President Andrew Boone also has those characteristics. Plaintiff further contends that, in both works, the challengers are "liberal democrat[s]" and the two campaign strategists are the "directors" of "dirty tricks." However, the Court notes that these characters – such as the "Reagan Republican-type," the "liberal democrat" challenger, and the scheming political strategist – are hardly protected expressions of an idea, but rather "stock characters," and thus, not protected elements of a copyrighted work as *scenes a faire*.[7] *See, e.g., Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004) ("A stock character is a stock example of the

---

[7] In fact, these types of stock characters appear in many modern film and television depictions of Presidential administrations and/or elections.

operation of the [*scenes a faire*] doctrine, and a drunken old bum is a stock character. If a drunken old bum were a copyrightable character, so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, a masked magician, and, in Learned Hand's memorable paraphrase of *Twelfth Night*, 'a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.' It would be difficult to write successful works of fiction without negotiating for dozens or hundreds of copyright licenses, even though such stereotyped characters are the products not of the creative imagination but of simple observation of the human comedy.") (internal citations omitted); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (stock characters are not protectible); *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F. Supp. 2d 41, 48 (D. Conn. 2007) (noting that uncopyrightable characters and elements such as "FBI agents working undercover, African American characters disguising themselves as Caucasian characters, and men disguising themselves as women, were non-novel concepts used in the film industry long before plaintiff's authors drafted the screenplay"); *Willis v. HBO*, No. 00 Civ. 2500 (JSM), 2001 U.S. Dist. LEXIS 17887, at *5 (S.D.N.Y. Nov. 5, 2001) (concept of "talent agents who operate in a 'bottom-dwelling ethical nether world, where lying is an art form; insincerity, a science, and personal convictions are as commonplace as nose rings' . . . is not original or protectible under the copyright law."); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) ("A stock character or basic character type, however, is not entitled to copyright protection.") (citing *Robinson v. Viacom Int'l, Inc.*, No. 93 Civ. 2539, 1995

WL 417076, at *9 (S.D.N.Y. Jan. 4, 1995) and *Sinicola v. Warner Bros.*, 948 F. Supp. 1176, 1185 (E.D.N.Y. 1996)). Further, as represented both in the treatment and amplification of "Go November" as well as in the feature-length film "Swing Vote," the candidates and strategists are not fully developed characters,[8] and, "[a]s Judge Learned Hand advised, 'the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.'" *Williams*, 84 F.3d at 589 (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930)). Therefore, the Court finds that any similarities in characters – such as the "Reagan-Republican type," the "liberal democrat," and the devious campaign strategist – are so general as to be stock characters and are thus not protectible elements of a copyrighted work under the *scenes a faire* doctrine.

Next, plaintiff argues that the works are substantially similar because they feature campaign staffs that employ "dirty tricks" as part of a "win at all costs" strategy. To that end, he directs the Court's attention to the following scenes from "Swing Vote": (1) President Boone's campaign strategist orders Republican operatives to send "angry white males" to the polls in Florida to intimidate "old Jews"; (2) Senator Greenleaf's campaign strategist intimates to the press corp that President Boone once had a gambling addiction; (3) President Boone arranges for

---

[8] Although the Court recognizes that any character development in "Go November" is necessarily limited by the abbreviated form of plaintiff's copyrighted work, those limitations do not change the fact that the "central political figures" plaintiff cites as a similarity between the two works are stock characters and, thus, not protectible.

Bud to meet Richard Petty; (4) Senator Greenleaf arranges for Bud to meet Willie Nelson; and (5) both campaigns run advertisements touting positions in contradiction of their party platform to curry favor with Bud. "Go November" also describes numerous specific scenes depicting various "dirty tricks" undertaken by opposing campaigns. (*See* Lynch Decl., Ex. 1 at 3-5.)

However, while the campaigns' attempts in "Swing Vote" to manipulate the voters, as described above, certainly lack integrity, they are not undertaken as part of a calculated campaign to sabotage the opposing candidate, as is the case in "Go November," where, as described in the treatment and amplification, campaign staffers for the incumbent resort to vandalism, trespass, voter fraud and bribery to derail the campaign of the challenger. Moreover, while scenes of "dirty tricks" and their ensuing fallout comprise twelve of the over thirty scenes described in the treatment of "Go November," the screen time devoted to any similar underhanded campaign strategies in "Swing Vote" takes a definitive backseat to the featured relationship among Bud, Molly, and Kate.

Ultimately, however, to the extent that both works feature acts of questionable morality undertaken by political campaigns in an effort to prevail in an election, such scenes are "'scenes a faire,' that is, scenes that necessarily result from the choice of a setting or situation," *i.e.*, that of a hotly-contested, modern election.[9] *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (while both works "depict cockfights, drunks, stripped cars, prostitutes and rats; both feature as central characters third-or fourth-generation Irish policemen who live in Queens and frequently drink; both show disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals[, t]hese similarities [] relate to uncopyrightable material . . . . Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx."); *see also MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004) ("elements that follow naturally from a work's theme rather than from an author's creativity" are not protectible). Moreover, the Court notes that lists of "similarities," like the one that plaintiff has provided, "are 'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'" *Williams*, 84 F.3d at 590 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984), *cert. denied*, 470 U.S. 1052 (1985)) (finding that the direct similarity of at least seven scenes in novels did not support finding of substantial similarity because "such a scattershot approach . . . fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another"); *see also Walker*, 784 F.2d at 50; *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 624 (2d Cir. 1982). Accordingly, the Court finds that the similarities cited by plaintiff amount to *scenes a faire* such that a lay observer would not perceive the two works to be substantially similar.

---

[9] In fact, at oral argument, plaintiff's counsel acknowledged this obvious point – that the concept of "dirty tricks" in campaigns was not protectible under copyright law. (*See* Oral Argument Transcript, at 30.) This is also true of other generalized concepts, such as a debate, which would be expected in any movie that contains the framework of a Presidential election.

Plaintiff next notes that both works portray the campaign staffs as "amoral." In support of this proposition, he directs the Court's attention to the following scenes in "Swing Vote," wherein: (1) President Boone invites Bud onto Air Force and further invites him to watch "Monday Night Football" with him; (2) Senator Greenleaf throws a party for Bud, secures one of his bandmate's release from prison in order to play at the gala and invites Bud's hero, Willie Nelson, to attend; and (3) President Boone plays poker with Bud and purposely loses.[10] Defendant responds that "[t]he ordinary observer would clearly recognize that such 'amorality' [as depicted in the aforementioned scenes] is fundamentally different from the Go November campaign staffers' trespass, vandalism, bribery, voter fraud, secret sexual liaisons with the enemy, and private file and email snooping." (Defendant's Reply, at 6.) The Court agrees. The scenes plaintiff highlights as demonstrative of this "amorality" are wholly dissimilar from those detailed in the treatment and amplification of "Go November," and any overarching similarities, *i.e.*, campaigns making morally questionable moves to secure an election win, which "follow naturally from [the] work's theme" constitute *scenes a faire*.

Plaintiff next argues that the structure, sequence and pace of "Go November" and "Swing Vote" are identical.[11] Specifically, he notes that (1) both works feature scenes with the incumbent President graced with all the formal trappings of the office followed immediately by scenes with the challenger in far more meager clothing and surroundings;[12] and (2) both works feature alternating scenes between the candidates in "quick-hitting snippets." The Court recognizes that copyright protections generally extend to "the 'pattern' of the work . . . the sequence of events and the development of the interplay of characters," *Williams*, 84 F.3d at 588 (internal citation omitted), but such is not the case if those elements are *scenes a faire*. *Id.* Here, a review of both works reveals that no rational

___

[10] Plaintiff also discusses the scenes in "Swing Vote" wherein first, Molly perpetrates voter fraud by attempting to vote on behalf of her absentee father and later, her father lies under oath that it was he who signed the voter roll, as evidence that both works depict voter fraud. (*See* Plaintiff's Memorandum of Law, at 22-23.) However, not only is such a comparison irrelevant to the proposition that the works are similar because they feature amoral *campaign staffers*, it also fails to establish any substantial similarity because the acts of fraud could not be more different – Molly's fraud is committed in an effort to participate in the political process and triggers the central plot of the film, while the voter fraud in "Go November" is but one act of many committed by campaign staffers in an effort to secure the election of their candidate by any means necessary.

[11] As an initial matter, the Court notes that it is difficult to assess some of these elements in the instant case where one is comparing a 4-page treatment that is simply a list of proposed scenes (as well as the brief amplification), with no particular suggested pace or timing, to a finished 120-minute feature film. Nevertheless, the Court accepts the plaintiff's somewhat speculative characterization of the sequencing and pace (as gleaned from the treatment and amplification) for purposes of defendants' motion and finds that such an argument fails on the merits, as discussed *infra*.

[12] Defendants note, and the Court agrees, that "Swing Vote" never overtly refers to any "disparity in resources" between the two campaigns. Moreover, the difference in the quality of the clothing worn by the candidates in the two scenes referenced by plaintiff, if any, would only be discernable to an individual with a particularly keen eye for fashion and certainly was not immediately apparent to the Court.

trier of fact can conclude that those elements are substantially similar in the instant case. For instance, "Go November" spans a period of months, between the parties' respective conventions and election day. "Swing Vote" takes place over the course of ten days. "Go November" describes a film wherein the action jumps from the activities of one political campaign to those of the opponent. While the scenes which involve the political campaigns in "Swing Vote" are often portrayed in immediate sequence, (as in "Go November"), those sequences are broken up within the overall course of events by lengthier scenes featuring Bud, Molly and Kate, as well as their respective friends and co-workers. Plaintiff attempts to dispute this and argue that "Swing Vote" is not about Bud and his daughter. (*See* Oral Argument Transcript, at 28 ("[Plaintiff's counsel]: Judge, we would take a very different view. We don't believe this movie [*i.e.*, "Swing Vote"] is about Bud and his daughter at all."); *see also* Plaintiff's Memorandum of Law, at 10 ("Swing Vote is not about Bud Johnson and his daughter.").) However, the Court views this position as beyond cavil. First, that argument is rebutted with undisputed quantitative evidence that the vast majority of the scenes in "Swing Vote" deal with the interactions between Bud and Molly, Bud and his employer, Bud and/or Molly and Kate, or Kate alone or with her employer, rather than scenes devoted to the presidential candidates or their teams. In fact, defendants assert (and the Court has confirmed from its own review) that approximately 90 of the 120 minutes of the movie are devoted to these interrelationships, while only approximately 30 minutes are devoted to the presidential candidates and their campaign ads. Second, and more importantly, from a qualitative manner, these interrelationships, involving Bud, Molly, and Kate, permeate every aspect

of movie and are the dominating influence of its structure, pace, and sequence, when compared to campaign scenes. This is in sharp contrast to "Go November," where the structure, pace and sequence are dominated by the alternating "dirty tricks." Thus, both quantitatively and qualitatively, the works have an entirely different structure, pace, and sequence. *See A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F. Supp. 2d 41, 50 (D. Conn. 2007) ("Plaintiff claims that the pace of both works incorporates a sketch comedy approach where the plot does not drive the stop-and-start pace. However, [plaintiff's work] is much less stop-and-start than [defendant's work], with [the latter] incorporating a greater variety of scenes and many more subplots than does [the former]."). Further, even if there were a substantial similarity in the pacing of the two works, "the pace, without more, does not create an issue of overall substantial similarity between the works." *See, e.g., Williams*, 84 F.3d at 589-90.

Plaintiff further argues that the works are substantially similar because the endings are identical; in "Go November," the final scene is described as "voter goes into voting booth and closes the curtain," while in "Swing Vote," the film concludes with Bud casting the deciding vote of the election. The voter in "Go November" appears to be an anonymous figure, while the voter in "Swing Vote" is the title role. There is nothing to suggest in the treatment or amplification of "Go November" that the voter featured at the end is casting the dispositive vote, while "Swing Vote" revolves around the premise that Bud's vote will determine the outcome of the election. Therefore, though both works conclude with a single voter casting a ballot, the expression of that idea is very different. *See Williams*, 84 F.3d at 590 ("even those scenes that appear

similar in their abstract description prove to be quite dissimilar once examined in any detail"); *see also Kregos v. The Assoc. Press*, 3 F.3d 656, 663 (2d Cir. 1993) ("a copyright does not protect an idea, but only the expression of an idea"); *Chase-Riboud v. Dreamworks, Inc.*, 987 F. Supp. 1222, 1232 (C.D. Cal. 1997) (in denying plaintiff's motion for a preliminary injunction, court determined that story endings that both "link[ed] [protagonist]'s return to Africa with a voice traveling back across the Atlantic to a symbol of the Civil War" were most likely not substantially similar because "the expression of the[] ideas [wa]s different"). More importantly, although the final scene was going to decide the next President of the United States in "Swing Vote," the outcome of the election was not important to the overall theme and plot of the movie – namely, the personal development of Bud and his relationship with his daughter. Thus, the ending, although somewhat of a tease to the audience, was hardly novel and was a negligible part of the movie's overall structure. Similarly, the final scene in "Go November" also was not a unique or critical component of the overall plot and feel of the work. In fact, in the treatment, the ending is only mentioned in one sentence as one scene in the over thirty scenes listed. In addition, in the amplification, although there is a paragraph devoted to the "surprise ending," the focus of that paragraph is not its importance to the overall story, but rather the post-movie marketing that could be done from such an ending, including having the viewers vote for the candidate on-line after the movie and a potential sequel movie about the first 100 days in office of the audience-chosen winner. Thus, any common facial elements of the final scene, when considered in the context of the works as a whole, could not lead a lay observer to conclude the works are substantially similar and no rational trier of fact could conclude otherwise.

Finally, in his submission after oral argument, plaintiff further suggests that the Court should apply Ninth Circuit law and utilize a lower standard of proof for substantial similarity because it is undisputed (for purposes of this motion) that a high degree of access to plaintiff's work exists. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000). The Court finds this argument unavailing for two reasons. First, although plaintiff suggests a "choice of law" analysis may warrant application of California law on the federal copyright claim, that contention is simply without merit. This Court is bound to apply the standard articulated by the Second Circuit, not the Ninth Circuit, for federal copyright claims. Second, plaintiff would still lose under the Ninth Circuit standard because the works at issue here lack any concrete or articulable similarities of protectible elements. In fact, that is precisely what the Ninth Circuit found in the case relied upon by plaintiff, in which it affirmed the district court's grant of summary judgment for defendants where "[t]he court determined that the works' few similarities operate at a general, abstract level and that no jury could reasonably find substantial similarities between the two works." *Funky Films, Inc. v. Time Warner Ent'mt Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006). Specifically, in *Funky Films*, in which the court compared plaintiff's screenplay "The Funk Parlor" with episodes of defendants' television series "Six Feet Under," the Ninth Circuit noted that "[a]t first blush, the[] apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot characters, themes, mood, pace, dialogue or sequence of

events." The Court further explained:

> At a very high level of generality, both works share certain plot similarities: the family-run funeral home, the father's death, and the return of the "prodigal son," who assists his brother in maintaining a family business. But [g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind . . . . The similarities recounted throughout appellants' brief rely heavily on *scenes a faire* – not concrete renderings specific to "The Funk Parlor" – and are, at best, coincidental. Consequently, the two works are not substantially similar.

*Id.* at 1081 (citations and quotations omitted). Moreover, on the issue regarding the lack of discovery, the Ninth Circuit noted that "[n]o amount of proof of access will suffice to show copying if there are no similarities, and in this case, additional discovery would not change the fact that the two works lack any concrete or articulable similarities." *Id.* (quotations and citations omitted). Here, as in *Funky Film*, there are certain abstract similarities between "Go November" and "Swing Vote" – including a modern, tightly-contested presidential race between an incumbent Republican and a Democratic challenger, campaign staffers and candidates pandering to voters, speeches, and a debate. However, these are non-protectible *scenes a faire* and the two works lack any concrete similarities at any other level. Thus, plaintiff's claim could not survive summary judgment even

under the more relaxed Ninth Circuit standard.

In sum, the similarities plaintiff highlights between the treatment and amplification of "Go November" and the feature film "Swing Vote" are not protectible as *scenes a faire*, or, even if protectible, are of such "small import quantitatively or qualitatively" that no lay observer would consider the works to be substantially similar to one another. Although the Court has analyzed each of plaintiff's arguments separately, that should not be misconstrued as a failure by the Court to also consider plaintiff's arguments of similarities collectively. The Court recognizes that, as the Second Circuit has emphasized and as noted earlier, a court "is not to dissect the works at issue into separate components and compare only the copyrightable elements." *Boisson v. Amer. County Quilts and Linens, Inc.*, 273 F.3d 262, 272 (2d Cir. 2001). Instead, copyright law requires a court to consider "such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 588 (citations omitted); *accord Tufenkian Imp. Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134-35 (2d Cir. 2003); *see also Boisson*, 273 F.3d at 272 ("the test is guided by comparing the 'total concept and feel' of the contested works") (citation omitted); *see generally Krofft v. McDonalds Corp.*, 562 F.2d 1157, 1169 (9th Cir. 1977) ("[I]t is the combination of many different elements which may command copyright protection because of its particular subjective quality."). Moreover, dissimilarities between some aspects of two works does not relieve the infringer of liability if the standard of substantial similarity is met when the overall works are analyzed. *See Williams*, 84 F.3d at 590 (noting that the law requires "the lay observer to focus on similarities rather than

differences when evaluating a work. Only when the similarities are insubstantial or unprotectible will a claim fail."). However, having carefully reviewed the works in the instant case under the applicable standard, the Court concludes that all of the similarities between the works arise from noncopyrightable elements and no lay observer – when comparing the total concept and feel, theme, characters, plot, scenes, sequence, pace and setting – could find the works as a whole to be substantially similar. Accordingly, defendants are entitled to summary judgment on plaintiff's first cause of action against them for copyright infringement because of the lack of "substantial similarity" as a matter of law.

## C. State Law Claims

In addition to the federal copyright claim, plaintiff also asserts state law claims for unfair competition against defendants Grammer, Stark and Grammnet, and fraud and misrepresentation against defendants Grammer and Stark. Those defendants have not moved to dismiss those claims in the instant motion, but rather urge the Court to decline pendent jurisdiction over them. To that end, "[i]n the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06 Civ. 6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986)). Since the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain these matters of state law in this case, the Court, in

its discretion, "decline[s] to exercise supplemental jurisdiction over [plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial . . . the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.*, No. 99 Civ. 3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

However, plaintiff has requested leave to file a second amended complaint to allege diversity jurisdiction with respect to the state claims. That application is granted and plaintiff will have 30 days to submit a second amended complaint that provides a basis for the Court's exercise of diversity jurisdiction over the remaining state causes of action.

IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiff's first cause of action under 17 U.S.C. § 101, *et seq.*, is granted. Plaintiff shall submit a second amended complaint within 30 days of this Memorandum and Order providing a basis for diversity jurisdiction over the remaining state claims.


SO ORDERED.


_____

JOSEPH F. BIANCO
United States District Judge


Dated:      May 11, 2009
            Central Islip, New York

* * *

The attorney for the plaintiff is Todd C. Rubenstein, Esq., Abrams, Fensterman, Fensterman, Eisman, Greenberg & Formato, 1111 Marcus Avenue, Suite 107, Lake Success, NY 11042. The attorneys for the defendants are John J. Lynch and John F. Burleigh, Esqs., Jacobs deBrauwere LLP, 445 Park Avenue, 17th Floor, New York, NY 10022.